UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **DENNEROLL HOLDINGS PTY LIMITED** and **DENNEROLL INDUSTRIES INTERNATIONAL PTY LIMITED,**  Plaintiffs, v.  **CHIRODESIGN GROUP, LLC and MARIE L. WEBSTER, INDIVIDUALLY AND DBA CHIRODESIGN GROUP**  Defendants. | Civil Action No. 4:15-cv-00740 |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Disqualify Plaintiffs' Counsel. (Doc. No. 21.) After considering the parties' filings, all responses and replies thereto, the testimony of Marie Webster and Jason Mueller,[1] and the applicable law, the Court finds that Defendants' motion should be **DENIED**.

**I. Background**

    **A. Procedural Background**

This Motion arises in the context of a patent infringement suit filed by Plaintiffs Denneroll Holdings PTY Limited and Denneroll Industries International PTY Limited (collectively, "Denneroll") on March 20, 2015 against Defendants Marie Webster and ChiroDesign Group, LLC (collectively, "Webster").[2] Denneroll claims that, by "making, using,

---

[1] The Court held an evidentiary hearing on August 18, 2015 at which both Webster and Mueller testified.

[2] ChiroDesign is a limited liability company owned and operated by Webster.

1

offering to sell, and selling large and small LifeCurve Roll products," Webster has willfully infringed on U.S. Patent No. 8,713,732, which is owned by Denneroll.[3] (Doc. No. 1.)

Denneroll is represented in this patent infringement lawsuit by Cole Mackey and Brit Nelson of Locke Lord LLP ("Locke" or "Locke Lord"). Webster has moved to disqualify Locke Lord from representing Denneroll on the grounds that "Locke Lord previously had an attorney-client relationship . . . [with Webster] concerning this same matter." (Doc. No. 21 at 1.) Specifically, Webster contends that she entered into a *de facto* attorney-client relationship with Jason Mueller, who is also a partner at Locke Lord, in September of 2014.

### B. Factual Background

On August 18, 2014, a Florida attorney representing Denneroll sent a letter (the "Stemer Letter") to Webster stating that ChiroDesign's LifeCurve Roll product potentially infringes on Denneroll's patented design. On September 22, Webster contacted Mueller regarding his legal services.[4] On the call, which was brief in duration, Mueller requested a few pieces of information from Webster (*e.g.*, the name of Webster's company, and the name of the adverse party) so that he could run a conflicts check. Webster emailed him the requested information later that day. Webster did not send Mueller the Stemer Letter or any other material.

On September 23rd, Mueller ran a conflicts check and asked his associate, Paul Lein, to conduct some "preliminary research." The requested research was apparently very cursory in nature, involving little more than Lein searching publicly available records to (i) identify the

---

[3] Denneroll also alleges a claim of false advertising in violation of 15 U.S.C. § 1125(a).

[4] Webster had no prior relationship or contact with Mueller. Mueller testified that he frequently receives "cold calls" from potential clients, and it "has long been his regular practice to tell all such potential clients that he does not represent them and will not be able to do so unless, after clearing conflicts, he and the potential client agree to the terms of the representation." (Dec. of J. Mueller ¶5.) Mueller "is confident" that he advised Webster similarly during their first phone call. (*Id.*)

patent at issue[5] and (ii) determine whether Denneroll had filed any litigation enforcing its patents. Later that day, Mueller emailed Webster the results of Lein's research along with a proposed engagement agreement (the "Proposed Agreement"). The Proposed Agreement stated that Locke had cleared conflicts and would be able to advise Webster if she chose to engage the firm. The agreement required, amongst other terms, that Webster immediately pay Locke a $4,000 retainer.

On September 25th, Webster and her business advisor telephoned Mueller.[6] During the call, Mueller presented the terms on which he would agree to represent Webster, but the parties were unable to reach an agreement. Webster was particularly concerned by the amount and nature of the retainer.[7] At that point, Webster inquired as to her options moving forward. In response, according to Webster:

> Mr. Mueller laid out the available options. One option . . . was for his law firm to undertake an analysis of LifeCurve Rolls and the patents to provide advice whether Denneroll 'has a case against me' or words to that effect. A second discussed by Mr. Mueller was to take a 'wait and see approach.' Basically Mr. Mueller explained that we could do nothing and 'wait and see' whether Denneroll was 'serious' about this, and whether they would actually pursue the matter.

(Dec. M. Webster ¶ 11.) Webster elected to take the "wait and see" approach.

On March 24, 2015, Denneroll filed a patent infringement suit against Webster involving the same patent referenced in the Stemer Letter. On April 13, Webster called Mueller about the lawsuit. Mueller asked Webster to email him the complaint, but as Webster was about to

---

[5] On her initial phone call with Mueller, Webster had been unable to locate the Stemer Letter or identify the patent referenced therein, so Lein was tasked with attempting to identify the patent at issue.

[6] Webster's business advisor is also her fiancé.

[7] Webster insists that the parties did not discuss the Proposed Agreement *per se*, but admits that they discussed generally the terms on which Mueller would agree to represent her. It appears that these were the same terms as those contained in the Proposed Agreement.

3

forward the complaint to Mueller, she noticed that Locke Lord was listed as Denneroll's counsel and called Mueller to investigate. Mueller asked Webster to send him the complaint so that he could review it. After seeing that Nelson and Mackey were representing Denneroll, Mueller notified Webster that Locke Lord could not represent her, and Locke, eventually, instituted a formal ethical screen.[8] Webster now seeks to disqualify Locke Lord from representing Denneroll.

## II. <u>Legal Standard for Disqualification</u>

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). The Southern District of Texas, pursuant to 28 U.S.C. § 2071, has adopted the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules") to govern attorneys' professional conduct. *See* Local Rules, Rule of Discipline 1A–B; *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992) ("The district court's authority to promulgate local rules is derived from 28 U.S.C. § 2071, which allows the courts only to adopt 'rules for the conduct of their business.'"). But the Fifth Circuit has recognized that a court's "local rules alone cannot regulate the parties' rights to counsel of their choice." *Tendeka, Inc. v. Glover*, 2014 WL 2002260, at *3 (S.D. Tex. May 15, 2014) (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)). Courts must also "consider [motions to disqualify] governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights." *Id*. The "source for the standards of the profession has been the canons of ethics developed by the American Bar Association," (the "Model Rules") and the Fifth Circuit looks carefully at the "admonition of canon 9 that lawyers should 'avoid even the appearance of

---

[8] There is no evidence or suggestion of any collusion between Mueller, Nelson, and Mackey (*e.g.*, that Mueller alerted Nelson and Mackey to the opportunity to represent Denneroll).

4

impropriety.'" *Id*. Thus, here, both the Model Rules and the Texas Rules are relevant to a motion to disqualify, but neither is dispositive. *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 2012 WL 3453696, at *2 (N.D. Tex. Aug. 14, 2012). And even to the extent that those rules apply, they should not be applied "mechanically." *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 300 (5th Cir. 2009). Rather, the court should consider "all of the facts particular to the case in the context of the relevant ethical criteria." *Id*. (internal quotations omitted).

Webster alleges that Mueller violated Texas Rule 1.09 and Model Rule 1.9, which set forth attorneys' duties to former clients. Texas Rule 1.09(a) provides that, "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client . . . if it is the same or substantially related matter."[9] Based on this language, "In cases involving an alleged conflict of interest due to one party's attorney's prior representation of the other party, the Fifth Circuit applies a substantial relationship test: a party seeking to disqualify opposing counsel on the ground of former representation must establish two elements: (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and (2) a substantial relationship between the subject matter of the former and present representations." *Tendeka*, 2014 WL 2002260, at *4.

If the substantial relationship test is satisfied, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation," and the lawyer *must* be disqualified. *Am. Airlines*, 972 F.2d at 614. In other words, "the provision of legal advice on a substantially related matter by itself requires disqualification." *Id.* at 619. "This is true even in cases where there is no chance that confidential information might be used

---

[9] According to the Fifth Circuit, Texas Rule 1.09 and Model Rule 1.9 are "identical . . . in all important respects." *Am. Airlines*, 972 F.2d at 610 n.2.

against the former client, since a client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the clients in the same matter." *Tendeka*, 2014 WL 2002260, at *4 (internal quotations omitted).

## III. Analysis

Locke concedes that "the subject of [Webster's] preliminary inquiry is substantially related to the present lawsuit," satisfying the second prong of the substantial relationship test. (Doc. No. 23 at 13 n.2.) Thus, Mueller's potential disqualification turns on the first prong of the test: whether "an actual attorney-client relationship" arose between Mueller and Webster. *Am. Airlines*, 972 F.2d at 614.

"The attorney-client relationship is contractual, whereby an attorney agrees to render professional services for a client."[10] *Hill v. Hunt*, 2008 WL 4108120, at *3 (N.D. Tex. Sept. 4, 2008) (citing *Mellon Serv. Co. v. Touche Ross*, 17 S.W.3d 432, 437 (Tex. App.—Houston [1st Dist.] 2000)). Parties may expressly create such a relationship by contract, or a *de facto* attorney-client relationship may be implied from their actions. *Great Am. Ins. Co.*, 2003 WL 21414676, at *3 (citing *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex. App.—Corpus Christi 1991, no pet.)). But regardless of whether the agreement is express or implied, "[a]ll that is required under Texas law is that the parties, explicitly or by their conduct, manifest an intention to create the attorney-client relationship." *Hill*, 2008 WL 4108120, at *3. This

---

[10] Although motions to disqualify are "determined by applying standards developed under federal law," Texas federal courts typically resort to Texas state law when deciding motions to disqualify. *See Hill*, 2008 WL 4108120, at *3 (acknowledging that "[m]otions to disqualify an attorney are substantive motions determined by standards developed under federal law," but then applying state law to determine existence of attorney-client relationship); *Great Am. Ins. Co. v. Christopher*, 2003 WL 2141467 (N.D. Tex. June 13, 2003) (same); *see also Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F. Supp. 3d 751, 769 (W.D. Tex. 2014) (stating that the court looks to Texas case law for guidance in motion to disqualify). This is likely because "[t]he attorney-client relationship is contractual," *Hill*, 2008 WL 4108120, at *3, and contract law is the province of state common law.

determination "is based on an objective standard, not on the parties' alleged subjective states of mind." *Id.* at *8 (citing *Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 311, 346 (Tex. App.—San Antonio 2006, pet. struck)). Payment of fees is not dispositive of the issue of whether there is an attorney-client relationship, *id.*, but the parties must understand and agree to the "nature of the work to be done and the compensation to be paid." *Gillis v. Provost & Umphrey Law Firm, LLP*, 2015 WL 170240, at *10 (Tex. App.—Dallas 2015); *see also SMWNPF Holdings, Inc. v. Devore*, 165 F.3d 360, 364 (5th Cir. 1999) (citing *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989); *Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App.—Dallas 2012) ("The parties should *clearly and expressly* agree to the nature of the work to be done and the compensation to be paid") (emphasis added).

Webster's arguments in favor of an attorney-client relationship rest primarily on two pieces of evidence: (A) the contents of an email dated September 23rd, 2014, and (B) the telephone call between Mueller and Webster on September 25th.

**A. The September 23rd Email**

As evidence of Mueller's manifestation of intent, Webster first points to the parties' initial communications on September 22 and September 23, 2014.[11] In particular, Webster cites an email from Mueller, dated September 23rd, attaching the Proposed Agreement and the results of some "preliminary research" conducted by Locke Lord associate Paul Lein. (Doc. No. 21 at 13.) The Proposed Agreement states in part: "I write to confirm that we have cleared conflicts, and are able to advise you regarding the patent enforcement (and potential threatened litigation) communications you received from [Denneroll]." (Dec. of J. Mueller, Ex. C at 11.) Webster claims that she understood these words—specifically, "[we] are able to advise you"—to mean

---

[11] Webster does not rely on the events of April 13th in her arguments.

that Mueller would provide her with legal advice. Additionally, the header on the Proposed Agreement states "Privileged Attorney-Client Communication," which, according to Webster, signaled that an attorney-client relationship had already begun.

Webster's reliance on the language of the Proposed Agreement is unpersuasive. As a technical matter, a person's *ability* to do something does not mean that he promises to do it. And technical matters aside, taken in the context of the Proposed Agreement as a whole, these cherry-picked phrases could not reasonably be taken as a manifestation of Mueller's intention to represent Webster. Just the opposite, the Proposed Agreement indicated that an attorney-client relationship had not yet begun, and would begin *only* if Webster agreed to the terms of the agreement—which she never did. (*See, e.g.*, Doc. No. 21, Ex. 5, at 1 ("*Should you choose to engage* Locke Lord LLP . . . to provide ChiroDesign Group . . . with legal services, this letter shall govern that engagement.")); *see also* Restatement (Third) of the Law Governing Lawyers §14 (indicating that a lawyer's consent may be conditioned on the successful completion of an engagement agreement).

### B. The September 25th Phone Call

Of course, as Webster has correctly noted, a signed engagement letter is not a prerequisite to an attorney-client relationship. *Hill*, 2008 WL 4108120, at *8. Such a relationship can be "implied from the conduct of the parties." *Id*. To that end, she points to Mueller's conduct on their September 25th phone call, arguing that, despite the unsigned Proposed Agreement, Mueller implicitly manifested an intention to enter into an attorney-client relationship.[12]

---

[12] Webster also cites her eight-minute phone call with Mueller on September 23rd, but the call is not a compelling basis for finding an attorney-client relationship. Webster admits that Mueller provided no legal advice on the call, and it appears that, as of the call, even Webster did not believe that Mueller had agreed to represent her. In her briefing, she implies that one of the

8

According to Webster, she "called Mr. Mueller . . . specifically seeking legal advice for a course of action," and in response, Mueller "laid out the available options." *See* Section I.B., *supra*.

Taken in isolation, this exchange between Webster and Mueller could conceivably seem emblematic of an attorney-client relationship. But the Court must not let this one evidentiary shard trump all the others. "When a court is asked to find a *de facto* relationship, it is asked to focus . . . on the facts and circumstances as a whole," not any one fact in isolation. *Great Am. Ins. Co.*, 2003 WL 21414676, at *4. Here, viewed as a whole, Mueller's conduct cannot reasonably be taken as a sufficient manifestation of intent. He had indicated on multiple occasions that he was unwilling to represent Webster unless she agreed to his proposed terms. And even assuming that Mueller's "available options" comment can be characterized as "legal advice," it is not the kind of substantive legal advice that can give rise to a *de facto* attorney-client relationship.

To establish an attorney-client relationship, the parties must understand and agree upon the "nature of the work to be undertaken and the compensation to be paid." *Gillis*, 2015 WL 170240, at *10; *see also SMWNPF Holdings, Inc*. 165 F.3d at 364. But here, there was no such understanding or agreement—if anything, there was express *disagreement* as to the terms of representation. On September 23rd, shortly after clearing conflicts, Mueller sent Webster a proposed engagement agreement setting forth the terms on which he would agree to represent her, not the least of which was a requirement that Webster provide upfront payment of a $4,000 retainer. The parties then discussed Mueller's proposed terms on a telephone call two days later. But during this September 25th call—which, notably, is the same call on which Webster claims Mueller manifested an intention to represent her—the parties were unable to come to any

---

reasons that she wanted her fiancé to join the September 25th call was because hiring Mueller would be a significant decision that would affect the couple's finances. (Doc. No. 21 at 4.)

9

agreement as to the terms of representation. To the contrary, Webster specifically expressed concerns regarding payment of the retainer, and Mueller responded that he was unwilling to represent her absent that payment.[13] (Ev. Hr'g Tr. 42:22-45:23, 71:19-73:21, Aug. 18, 2015.)

Webster's contention that Mueller somehow otherwise manifested a willingness to enter into an attorney-client relationship is unpersuasive. Her argument relies almost exclusively on the allegation that Mueller gave her "legal advice" on their September 25th phone call. As an initial matter, the proposition that Mueller provided "legal advice" is questionable—although he referenced two "available options," he made no "recommendation regarding a decision" as between the two options.[14] (Ev. Hr'g Tr. 62:4-17, 73:15-18, 49:15-21); *see Merriam-Webster Dictionary*, *available at* http://www.merriam-webster.com/dictionary/advice (defining "advice" as a "*recommendation* regarding a decision or course of conduct") (emphasis added). And semantics aside, Mueller's "advice" is hardly the type of "substantive legal discussion[] regarding [the litigation]" that gives rise to an implied attorney-client relationship. *See Hill*, 2008 WL 4108120, at *13 (finding persuasive the fact that "there is no evidence that [the attorney and alleged client] engaged in substantive legal discussions regarding [the litigation]"); *Gillis*, 2015 WL 170240, at *11 (meeting to discuss the possibility of the prospective client becoming a relator in an FCA lawsuit did not give rise to attorney-client relationship). Indeed, there is no indication that Mueller's "advice" was based on substantive legal analysis, that the

---

[13] There is some dispute as to whether Mueller indicated that he might be willing to reduce the amount of the retainer. (*Compare* Ev. Hr'g Tr. 62:13-63:9, *with* 44:23-45:16.) The Court finds, as a matter of fact, that Mueller did not offer to reduce the amount of the retainer. (*See* Ev. Hr'g Tr. 64:3-12.) And in any event, this much is clear: the parties had not arrived at mutually agreeable terms regarding the representation, and based on Webster's concern regarding Mueller's retainer and hourly rates, it would have been reasonable to conclude that they never would.

[14] Moreover, given the context of their conversation, it sounds like Mueller was providing Webster with options for hiring an attorney, not for taking legal action.

10

parties ever discussed the merits of Denneroll's lawsuit, or that Mueller informed Webster of the legal implications of either "available option." Just the opposite, by Webster's own admission, Mueller indicated that he had *not* conducted any research to determine "whether Denneroll has a case against [her]."[15] (*See* Dec. M. Webster ¶ 11; *see also* Ev. Hr'g Tr. 61:23-62:16, 50:15-51:5, 48:15-23.)

***

At the evidentiary hearing, Webster argued that Mueller's putative legal advice is the *sine qua non* of their *de facto* attorney-client relationship: "she asked for advice and . . . he gave that advice, and that is what makes a contract." (Ev. Hr'g Tr. 91:23-25.) The Court disagrees. To the extent that it can even be deemed "legal advice," Mueller's off-hand comment constitutes no more than a fleeting wisp of lawyerly conduct, incapable of giving rise to an attorney-client relationship and the many rights and obligations that it entails. And it certainly is insufficient to counterbalance the substantial evidence indicating that Mueller did *not* intend to enter into such a

---

[15] Webster stated at the hearing that she intends to call Mueller as a witness at trial in support of her "advice of counsel" defense to Denneroll's argument that she willfully infringed on the '732 patent. (*See* Ev. Hr'g Tr. 66:21-67:22.) She claims that this could be another potential basis on which to disqualify Locke Lord. (*Id.*); *see also* Texas Rule 3.08 ("Lawyer as Witness"). But this argument suffers from a flawed premise—that Mueller can testify at trial. By Webster's own admission, the *only* "legal advice" that she received from Mueller was that she could either (1) commission Locke Lord "to undertake an analysis of LifeCurve Rolls and the patents to provide advice whether Denneroll 'has a case against [Webster]'" or (2) take a "wait and see" approach. (Dec. M. Webster ¶ 11; *see also* Ev. Hr'g Tr. 61:23-62:16, 50:15-51:5, 48:15-23.) Mueller provided no legal advice regarding whether Webster's product infringes on Denneroll's patent. (*See id.*) Indeed, providing her with that type of advice is precisely what Mueller proposed as Option 1 ("provide advice [on] whether Denneroll 'has a case against [Webster]'"), but Webster elected to take the wait-and-see approach. *Id.* Because Mueller provided Webster with no advice regarding her product's potential infringement on Denneroll's patent, he has no information relevant to Webster's "advice of counsel" defense, and therefore, assuming proper objection is made by Denneroll, could not be called to testify at trial. *See* Fed. R. Ev. 402.

Additionally, as a procedural matter, Webster's motion to disqualify is expressly based on the grounds that Webster is Locke's former client. (*See* Doc. No. 21 at 8-10 (citing Texas Rule 1.09 and Model Rule 1.9)). The issue of whether Locke Lord could be disqualified on other grounds (*e.g.*, because Mueller might be required to testify at trial) is not before this Court.

relationship; Mueller repeatedly indicated throughout the parties' interactions—both orally and via a proposed written engagement agreement—that he would represent Webster only upon certain terms. To hold otherwise would place an unreasonable burden on attorneys, chilling even the most preliminary of discussions between a lawyer and his or her prospective client. This result would lead to undesirable consequences not only for those in the legal profession, but the prospective clients who seek their services.

## IV. Conclusion

The Court holds that Mueller and Webster did not enter into an attorney-client relationship, and, therefore, the substantial relationship test is not satisfied. Accordingly, Defendants' Motion to Disqualify Plaintiffs' Counsel is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **DENNEROLL HOLDINGS PTY LIMITED** and **DENNEROLL INDUSTRIES INTERNATIONAL PTY LIMITED,**  §§§§§ | |
| **Plaintiffs,** § | |
| v. § | Civil Action No. 4:15-cv-00740 |
| **CHIRODESIGN GROUP, LLC and MARIE L. WEBSTER, INDIVIDUALLY AND DBA CHIRODESIGN GROUP** §§§§ | |
| **Defendants.** §§ | |

## ORDER

Before the Court is the Motion to Disqualify filed by Defendants ChiroDesign Group, LLC and Marie L. Webster, individually and DBA ChiroDesign Group. (Dkt. No 21.) After considering the Motion, the Response filed by Locke Lord LLP, the Response filed by Plaintiffs, the evidence submitted to the Court, and the law, the Court finds that the Motion to Disqualify is without merit.

Accordingly, the Motion to Disqualify is **DENIED**.

Signed this 9th day of September 2015.

_____
Hon. Keith P. Ellison
United States District Judge

13